UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,        :

       v.        :        Indictment No.
                                                  15 Cr. 639 (SAS)
                                       :
ABDOULAYE DIALLO,

            Defendant.        :

                                       :
------------------------------------------------------------x

## SENTENCING MEMORANDUM

Stephanie M. Carvlin
Counsel for Abdoulaye Diallo
111 Broadway, Suite 701
New York, New York  10006
212-748-1636

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**..................................................................1

**I.    THE RELEVANT LEGAL FRAMEWORK**.................................1

    **1.  Mr. Diallo's History and Characteristics**............................2

        **a.  Mr. Diallo's Upbringing**.............................................2

        **b.  Mr. Diallo's Move to America**...................................4

        **c.  Mr. Diallo's Charitable Giving**..................................5

    **2.  The Guidelines Range – the Plea Agreement and the PSR**...............8

    **3.  The Kinds of Sentences Available**.........................................9

    **4.  The Nature and Circumstances of the Offense –**
        ..................................................................................9

**II.   WHAT SENTENCE IS SUFFICIENT BUT NOT GREATER
        THAN NECESSARY TO MEET THE STATUTORILY
        PRESCRIBED GOALS OF SENTENCING**........................12

**CONCLUSION**.........................................................................14

i

# TABLE OF AUTHORITIES

**Statutes**

18 U.S.C. §3553(a)..................................................................................passim

18 U.S.C. §3561(c)(1).........................................................................................9

18 U.S.C. §3583(b)(2).........................................................................................9

21 U.S.C. §841(b)(1)(C).............................................................................1, 8, 9

21 U.S.C. §846..................................................................................................1

**United States Sentencing Guidelines Provisions**

U.S.S.G. §2D1.1(a)(5)........................................................................................8

U.S.S.G. §2D1.1(c)(8)........................................................................................8

U.S.S.G. §3E1.1(a).............................................................................................8

U.S.S.G. §3E1.1(b).............................................................................................8

**United States Supreme Court**

United States v. Booker
     543 U.S. 220 (2005).................................................................................1

United States v. Fernandez,
     443 F.3d 19 (2d Cir. 2006)....................................................................13

United States v. Ministro-Tapia,
     470 F.3d 137 (2d Cir. 2006)...................................................................2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,              :

              v.                       :     Indictment No.
                                             15 Cr. 639 (SAS)
                                       :
ABDOULAYE DIALLO,
                                       :
              Defendant.
                                       :
------------------------------------------------------------x
```

**PRELIMINARY STATEMENT**

Abdoulaye Diallo will be sentenced by Your Honor on January 19, 2016, for his participation in a conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §846 and §841(b)(1)(C). Of course, Mr. Diallo bears responsibility for the actions he took that led to the instant prosecution, a fact that he willingly accepts. However, many factors, including Mr. Diallo's background of extreme deprivation, his extraordinary devotion to helping others are equally relevant to this Court's determination of the appropriate sentence to impose. I submit this Sentencing Memorandum to draw the Court's attention to these facts and to provide other information about Mr. Diallo and the offense that I believe should lead this Court to impose a non-Guideline sentence.

**I.    THE RELEVANT LEGAL FRAMEWORK**

As the Court knows, following the United States Supreme Court's decisions in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and subsequent

cases, a sentencing decision must be governed by the factors listed in 18 U.S.C. §3553(a). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the Guidelines range and any applicable Guidelines Policy Statements, the need to avoid sentencing disparities and the need to provide restitution to the victim. This Court must consider all of the 18 U.S.C. §3553(a) factors to derive a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. See United States v. Ministro-Tapia, 470 F.3d 137, 141-43 (2d Cir. 2006) (analyzing the "parsimony clause" of 18 U.S.C. §3553(a)).

1. **Mr. Diallo's History and Characteristics**[1]

   a. **Mr. Diallo's Upbringing**

Mr. Diallo was born in 1968 in a small village in the Republic of Mali. The village was composed largely of Mr. Diallo and his immediately family members – his father, his mother and his 14 siblings. (PSR at ¶51.) The family had very limited economic resources. They grew produce and sold cattle to survive. As the seventh of 15 children in a very poor family, in a very poor country – his village lacked even a reliable source of potable water, food was not always available –

---

[1] Mr. Diallo provided the details about his background and work history. Unless otherwise noted, I have not confirmed that information.

2

Mr. Diallo never had the opportunity to go to school. He has never learned to read or write any language. (PSR at ¶68.)[2]

Mr. Diallo's upbringing was marred by more than poverty. He reports that he was physically abused over the course of many years by one of his older brothers, Mamadou. The abuse became so severe that the local law enforcement authorities learned about it. Mamadou was warned by the police, and the beatings stopped. (PSR at ¶62.)

Mr. Diallo continues to suffer from depression [3]

However, in the past decade he has found significant relief by attending daily prayers at his local Mosque. (PSR at ¶65.)

---

[2] Mr. Diallo reports that in 2001 in an attempt to learn to read and write English he enrolled in an adult literacy course offered by a school located in Harlem. Following the September 11th attacks, Mr. Diallo, a Muslim, felt uncomfortable continuing at the program. He believed that he was no longer welcome there. (PSR at ¶69.)

[3] While discussing this abuse during his interview with Probation, Mr. Diallo became visibly emotional. He had to compose himself more than once when recounting how his brother had treated him. (PSR at ¶66.)

3

### b.     Mr. Diallo's Move to America

In part to escape his family issues, in part to escape the grinding poverty that life in Mali condemned him to, Mr. Diallo came to the United States in 1989 at the age of 21. While life in America was not as easy as Mr. Diallo had fantasized it would be, he was able to find employment here. He has done many kinds of lawful work over the course of the more than 25-years he has resided in this country.[4] (PSR at ¶¶71-73.)

When he first arrived in the United States, Mr. Diallo had few connections and little money. For several years, he sold socks from a table he set up on the streets in midtown Manhattan. When his English improved, Mr. Diallo worked at a store that provided private postal services to individuals. After more than a year and a half at that job, he waited tables at an Indian Restaurant. Mr. Diallo's stay at the restaurant was brief. After six months there, he decided he couldn't survive in New York – and send money back to his family – on what he was making. Using contacts he had made when he first came to the United States, Mr. Diallo worked for a company that shipped clothing, particularly socks, to African countries. By the late 1990's Mr. Diallo took a job at an African Restaurant in Harlem. Mr. Diallo left the restaurant shortly before the September 11 attacks. Following 9/11, he had trouble finding a job. In the wake of the increased concern about terrorism, employers had become more insistent on examining a

---

[4]Mr. Diallo entered the United States legally with a valid passport and a visa. However, he remained after his visa expired, and, with the exception of a short period of time when he reports he had a working permit, he has not been legally authorized to work in this country.

4

prospective employees' immigration status. Mr. Diallo had no working papers, and for several years he did odd jobs and survived as best he could.

In 2005, Mr. Diallo was hired as a driver by Yaya Kahan, a United Nations delegate from Mauretania. (PSR at ¶73.) Mr. Kahan, although representing Mauretania, was originally from Mali, and he was a member of Mr. Diallo's mother's tribe. Mr. Diallo worked as Mr. Kahan's driver for nine years until Mr. Kahan died of kidney disease at the end of 2014. This job provided the type of break Mr. Diallo had dreamed of in deciding to come to America. The job paid well – more than $2,000 a month. Mr. Kahan did interesting work. He lectured various groups from African nations, urging them to abandon the practice of genital mutilation. By driving Mr. Kahan, Mr. Diallo felt that he was playing a small role in this mission. Perhaps most significantly, Mr. Kahan, an educated, successful man, treated Mr. Diallo, a poor illiterate boy from small village in Mali, as an equal. Although his own brother had show disdain for Mr. Diallo, Mr. Kahan respected him,

Mr. Kahan's death caused Mr. Diallo great turmoil. He struggled financially and emotionally. He lost a good job that paid well. He lost a close friend. He lost a significant measure of his self-respect.

    c.    **Mr. Diallo's Charitable Giving**

Mr. Diallo's home country, Mali, is an extremely poor country today. It has been an extremely poor country over the three decades since Mr. Diallo left there. In a 2014 overview of Mali, the World Bank reported that Mali placed at 176 out of 187 countries and territories on the United Nation's Human

5

Development Index. In 2010, more than half – 51% -- of the population lived below the poverty level of $1.25 a day. See http://www.worldbank.org/en/country/mali; see also hdr.undp.org/en/countries/profiles/MLI.

One of the main motivations Mr. Diallo had in coming to the United States was to earn money he could send home to help support his village in Mali. Since his earliest months in the United States, Mr. Diallo has consistently helped provide for his family and for others from his country. (See Money transfer receipts, attached hereto as Exhibit A.) Indeed, he still sends money to his brother Ibrahim, to Ibrahim's wife Columbouna Sow and even to his brother Mamadou, the sibling who abused Mr. Diallo when Mr. Diallo was young. (See Money transfer receipts, attached hereto as Exhibit B.)

Mr. Diallo has always wanted to help his family. He knows what life without adequate food and water is like. However, over the years he has also felt that he has an *obligation* to take care of his siblings and others. When Mr. Diallo worked for Yaya Kahan, making a good salary, it was not difficult to send money home. As he notes, $100 goes a long way in Mali. However, while in the United States Mr. Diallo himself has frequently lacked sufficient money to meet his basic needs, and his desire to support his family in Africa has often resulted in unbearable financial pressure.

Mr. Diallo's urge to help others sometimes seems to border on the irrational. In response to fund-raising drives he heard on Malines radio, Mr. Diallo sent money to help finance the digging on a well in a village in Mali that lacked potable water. (See photographs, attached hereto as Exhibits C, D and E.) He

sent money to a man who had lost a limb. He reports that he sent money to Haiti in 2012 to provide relief to earthquake victims. He gives regularly to his mosque, as well as to a Christian church he sometimes attended with a friend.

Several of Mr. Diallo's friends and a family member have written e-mails to me about Mr. Diallo. They comment on his generosity. Taylor Gang notes that Mr. Diallo takes care of people "back home." (Taylor Gang e-mail, attached hereto as Exhibit F.) Yung Prince describes Mr. Diallo as "a good friend" who "always helps" when Mr. Prince needs him. (Yung Prince e-mail, attached hereto as Exhibit G.) Mr. Diallo's nephew, Hamidu Nian, describes an occasion when his uncle provided financial help

> Last year on[5] September I was about to go back to school and didn't have any shoes to wear, and he bought me sneaker I was more than happy he is wonderful.

(Hamidu Nian e-mail attached hereto as Exhibit H.)

In short, in many ways Mr. Diallo has led a very admirable life. He came from a background that was extraordinarily challenging. His financial circumstances growing up were so dire that he did not have the "luxury" of learning to read and write. He was abused and demeaned by an older brother – a father figure. Nevertheless, Mr. Diallo found the strength and courage to come to the United States to try to improve his and his family's position. For most of his time in this country he worked hard at humble employment. He grew into a sensitive and compassionate man who has taken seriously a heart-felt imperative to try to alleviate the suffering of others.

---

[5] I have left the original grammar and punctuation in the e-mails unchanged.

7

While consistently helping to provide for others, he has never lived a lavish life himself.[6] Since arriving the United States he has almost always lived with a roommate. He has never owned any real estate. He has no car, no cash in bank accounts and no assets. While Mr. Diallo indisputably violated the law, he did not engage in criminal conduct to become rich or to avoid the difficulty and drudgery of working at low status but lawful employment.

2. **The Guidelines Range – the Plea Agreement and PSR**

While this Court is no longer bound to impose a Guidelines sentence and the Guidelines do not provide the presumptive sentence, §3553 requires a District Court to "consider" the Guidelines, and in "order to fulfill this statutory duty to 'consider' the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Thus, one step in deciding what sentence is appropriate for Mr. Diallo is to calculate the Guidelines range for his offense.

Pursuant to a written agreement with the government, Mr. Diallo pled guilty to one count of conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §841(b)(1)(C). The parties stipulated that Mr. Diallo was responsible for conspiring to distribute at least 100 but less than 400 grams of heroin, an amount that corresponds to a base offense level of 24 pursuant to U.S.S.G. §§2D1.1(a)(5) and (c)(8). The agreement anticipates that Mr. Diallo will receive a three-level reduction for acceptance of responsibility as provided by U.S.S.G. §§3E1.1(a) and (b), resulting in a total offense level of 21.

---

[6]Mr. Diallo is now in arrears on his rent. He owes his landlord $4,497.76, $3,369 of which is overdue. See rental bill, attached hereto as Exhibit J.

(See PSR at ¶¶6-10.) Mr. Diallo has two Criminal History Category Points ("CHC") based on two convictions – one in 2005 and one in 2007 – for Attempted Possession of a Forged Instrument in the Third Degree in violation of New York Penal Law. He received a sentence of a conditional discharge for each offense. (PSR at ¶¶40, 41.) These two prior sentences place Mr. Diallo in CHC II. This combination of CHC and total offense level yield a Guidelines range of 41-51 months.

Probation's Guidelines determination as reflected in the PSR agrees with the parties' calculations. (PSR at ¶¶24-34, 42-43.)

### 3. The Kinds of Sentences Available

Section 3553(a) requires the Court to consider the kinds of sentences that are available. Mr. Diallo pled guilty to an offense that carries no mandatory minimum term of incarceration and a maximum term of 20 years. Thus, this Court may impose a sentence of any period of imprisonment from zero to twenty years. The Court also has the authority to sentence Mr. Diallo to a term of probation of not less than one or more than five years. 18 U.S.C. §3561(c)(1). Title 18 of the United States Code, Section 841(b)(1)(C) and 18 U.S.C. §3583(b)(2) require the Court to sentence Mr. Diallo to supervised release of three years if any term of imprisonment is imposed.

### 4. The Nature and Circumstances of the Offense

Of course the nature and circumstances of the offense are significant factors this Court must considering in determining the appropriate sentence to

impose. Mr. Diallo participated in a conspiracy to distribute heroin. This conduct is indisputably serious.

## II. **WHAT SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE STATUTORILY PRESCRIBED GOALS OF SENTENCING**

Ultimately, this Court must craft a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, protect the public, promote respect for the law, serve as an adequate deterrent and provide the defendant with needed educational or vocational training, medical care or other correctional treatment. It is respectfully submitted that none of these goals requires imposing a sentence of 41-51 months.

7

---

[7]When Mr. Diallo has finished serving whatever sentence the Court does impose, he will be deported to Mali. This alone will be severe punishment for a man who has spent his entire adult life – 26 years – in the United States. The Mali Mr. Diallo will return to is almost as poor economically as when he left. It is far more dangerous now. The *New York Times* reports that at least 36 people have been killed in six terror attacks in Mali this year – in addition to the November 20, 2015 attack at the Radisson Blu Hotel in Bamako –. Goldman, Russell, "What we Know and Don't Know About the Terrorist Attack in Mali," *New York Times*, Nov. 20, 2015.

Several aspects of Mr. Diallo's history and characteristics also weigh in favor of imposing a sentence of less than 41-51 months. Throughout his life Mr. Diallo has struggled with poverty. He was born into a poor family in a very poor country. He has worked at difficult, demanding jobs most of his life. In Mali he labored on his family's "farm" from such a young age that he never attended school. After struggling to come to the United States he found work in spite of his lack of education, minimal knowledge of English and complete absence of an understanding of the culture of this country. For many years, he held a series of low-status, low-paying jobs. In spite of the limitations he experience in his own life, Mr. Diallo developed deep compassion for the plight of others. He has helped support family, friends and strangers in need over the course of decades. All these factors are indications that Mr. Diallo is an individual who can conform his conducts to the requirements of the law and who has much to offer his society.

## **CONCLUSION**

In light of all of the §3553(a) factors, a sentence within the Guideline range of 41-51 months would be greater than necessary in this case to meet the goals of sentencing established by Congress in 18 U.S.C. §3553(a). It is respectfully submitted that an analysis of all of the relevant sentencing factors should instead lead the Court to impose a non-Guideline sentence

15

Respectfully submitted,

/s/ Stephanie M. Carvlin

cc: Assistant U.S. Attorney Robert Allen (via ECF)